*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JULIE BRESKO, Personal Representative of the
ESTATE OF LAMARR GREEN,

Plaintiff-Appellee,

v

BASHAR YALDO, MD,

Defendant,

and

SHAHRZAD ABBASSI-RAHBAR and ST JOSEPH
MERCY-OAKLAND,

Defendants-Appellants.

UNPUBLISHED
May 25, 2023

No. 357931
Oakland Circuit Court
LC No. 2020-179077-NH

Before: CAVANAGH, P.J., and K. F. KELLY and GARRETT, JJ.

GARRETT, J. (*concurring in part and dissenting in part*).

In a medical malpractice case, a "specialist" is "a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice." *Woodard v Custer*, 476 Mich 545, 561; 719 NW2d 842 (2006), quoting *Dorland's Illustrated Medical Dictionary* (28th ed). A general surgery resident is not transformed into a "specialist" in surgical critical care simply by virtue of participation in a brief required rotation in the surgical intensive care unit (SICU). Therefore, I respectfully dissent from the majority's conclusion that defendant Shahrzad Abbassi-Rahbar (Dr. Abbassi) was a "specialist" in surgical critical care at the time of the alleged malpractice. Instead, I would conclude that Dr. Abbassi was a "specialist" in general surgery. Nevertheless, I am constrained to agree that plaintiff's proposed expert, Dr. Jason Nirgiotis, is not qualified to provide standard-of-care testimony against Dr. Abbassi under MCL 600.2169(1)(b), as interpreted by *Woodard*, because Dr. Nirgiotis spent the majority of his time practicing the distinct specialty of pediatric surgery in the year before the alleged malpractice in this case. For

-1-

that reason, I concur in the majority's ultimate conclusion that defendants[1] were entitled to summary disposition on plaintiff's claims arising out of Dr. Abbassi's treatment of the decedent, LaMarr Green. I also concur in the majority opinion in all other respects.

## I. BASIC FACTS

Dr. Abbassi began her general surgery residency at St. Joseph Mercy-Oakland (SJMO) in 2015. The SJMO general surgery residency program requires residents to participate in several rotations in different specialties related to the practice of general surgery. On February 1, 2018, Dr. Abbassi began a scheduled two-month-long rotation in the SICU. The next day, Dr. Bashar Yaldo, a general surgeon, performed a hernia repair on Green, and Green was discharged the same day. Three days later, on February 5, 2018, Green presented to the emergency room at SJMO, reporting that he was vomiting and experiencing abdominal pain after the hernia operation. Green was admitted to the hospital and soon transferred to the SICU as his health declined.

During Green's nearly two-week stay in the SICU, he was cared for by several residents and attending physicians, including Dr. Abbassi. Dr. Yaldo also saw Green throughout his stay in the SICU and was listed as his attending physician on all progress notes. Dr. Yaldo performed a second surgery on Green on February 12, 2018, during which he discovered and addressed a small bowel obstruction. Throughout Dr. Abbassi's care of Green in the SICU, Dr. Abbassi worked directly with supervising physicians who were specialists in surgical critical care. Dr. Abbassi treated Green on at least six days during Green's time in the SICU until his unfortunate passing on February 19, 2018. According to Dr. Nirgiotis, Green's death certificate listed his causes of death as aspiration pneumonia, sepsis, and a small bowel obstruction due to an internal hernia.[2]

In bringing suit against Dr. Abbassi, plaintiff alleged in relevant part that Dr. Abbassi breached the applicable standard of care when: (1) on February 8, 2018, she cut back on Green's antibiotics when he was in septic shock; (2) on February 10, 2018, she started Green on tube feeds when he had a bowel obstruction; and (3) on February 15, 2018, she stopped Green's intravenous therapy (IV) antibiotics when Green was at high risk for redeveloping sepsis. Attached to plaintiff's complaint was an affidavit of merit from Dr. Nirgiotis, a physician board-certified in general surgery and pediatric surgery.[3] After discovery, defendants moved for summary

---

[1] Any reference to "defendants" refers to Dr. Abbassi and St. Joseph Mercy-Oakland.

[2] Aspiration pneumonia is an "infection of the lungs caused by inhaling saliva, food, liquid, vomit and even small foreign objects," and sepsis is a "life-threatening medical emergency caused by [the] body's overwhelming response to an infection." Cleveland Clinic, *Aspiration Pneumonia*, <https://my.clevelandclinic.org/health/diseases/21954-aspiration-pneumonia> (accessed May 2, 2023); Cleveland Clinic, *Sepsis*, <https://my.clevelandclinic.org/health/diseases/12361-sepsis> (accessed May 2, 2023). Dr. Nirgiotis opined that the aspiration pneumonia ultimately led to sepsis.

[3] Specifically, Dr. Nirgiotis is board-certified in the specialty of general surgery, with a certificate of special competency in the subspecialty of pediatric surgery. This certificate of special competency also constitutes a board certificate under MCL 600.2169(1)(a). See *Woodard*, 476

-2-

disposition. With respect to Dr. Abbassi, defendants argued that Dr. Nirgiotis was not qualified to offer expert testimony on her alleged malpractice because Dr. Abbassi was practicing as a "specialist" in surgical critical care, and Dr. Nirgiotis does not specialize in that field. The trial court denied summary disposition to Dr. Abbassi, but the majority reverses that decision, concluding that binding precedent "compel[s] the conclusion that Dr. Abbassi was a specialist practicing in surgical critical care at the time of the alleged malpractice." I depart from the majority on that holding.

## II. LEGAL BACKGROUND AND ANALYSIS

The proper determination of the standard of care applicable to Dr. Abbassi's alleged conduct in this case turns on inconsistent caselaw interpreting the expert qualification statute for medical malpractice cases. Relying on *Woodard*, *Gonzalez v St John Hosp & Med Ctr (On Reconsideration)*, 275 Mich App 290; 739 NW2d 392 (2007), and *Reeves v Carson City Hosp (On Remand)*, 274 Mich App 622; 736 NW2d 284 (2007), the majority concludes that surgical critical care is the applicable standard of care to Dr. Abbassi.

In *Woodard*, our Supreme Court undertook a comprehensive review of MCL 600.2169(1), the statute governing the required qualifications of an expert witness in a medical malpractice action. In relevant part, the statute provides:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

---

Mich at 565. One must become certified by the American Board of Surgery in general surgery before undergoing the required training for pediatric surgery certification. The American Board of Surgery, *Pediatric Surgery*, <https://www.absurgery.org/default.jsp?examoffered_ps> (accessed April 27, 2022).

(*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.  [MCL 600.2169.]

Beginning with § 2169(1)(a)'s "same specialty" requirement, *Woodard* explained that "if a defendant physician is a specialist, the plaintiff's expert witness must have specialized in the same specialty as the defendant physician at the time of the alleged malpractice." *Woodard*, 476 Mich at 560-561.  Turning to the dictionary, the Court approvingly cited a definition of "specialist" as "a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice." *Id*. at 561, quoting *Dorland's Illustrated Medical Dictionary* (28th ed). Considering this definition and the plain language of § 2169(1)(a), the Court concluded that a "specialist" did not have to be board certified. *Id*. at 561.  Thus, the Court described a "specialty" as a "particular branch of medicine or surgery in which one can *potentially become board certified*." *Id*. (emphasis added).  "Accordingly, if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery." *Id*. at 561-562. The Court also held that "[a] subspecialty, although a more particularized specialty, is nevertheless a specialty," and that the "same specialty" requirement similarly applied to subspecialties. *Id*. at 562.  Recognizing that a defendant physician may specialize in multiple areas, *Woodard* additionally held that "the plaintiff's expert witness must match the one most relevant standard of practice or care—the specialty engaged in by the defendant physician during the course of the alleged malpractice." *Id*. at 560.

Dr. Abbassi's involvement as a defendant in this case presents a wrinkle that was not decided in *Woodard*—how § 2169 applied to medical residents.  This Court, in *Gonzalez*, addressed that situation.  This Court first read *Woodard* as overruling prior precedent which held that residents are not specialists. *Gonzalez*, 275 Mich App at 299.  But *Gonzalez* did not broadly hold that residents are specialists anytime they are practicing in a specific field of medicine. Rather, applying the definition of "specialist" from *Woodard*, *Gonzalez* explained that only those residents who "limit their training to a particular branch of medicine or surgery and who can potentially become board-certified in that specialty are specialists for purposes of the analysis under MCL 600.2169(1)." *Id*.

*Reeves* is the final case relied upon by the majority. As the majority notes, *Reeves* involved a medical malpractice suit against a board-certified family medicine doctor who treated the plaintiff in the emergency room at the time of the alleged malpractice. *Reeves*, 274 Mich App at 623.  This Court explained that the defendant physician was practicing outside of her board-certification because she was working in the emergency room. *Id*. at 628.  As a result, this Court determined that emergency medicine was the one most relevant standard of care applicable to the alleged malpractice. *Id*.  The Court summarized its conclusion: "[B]ecause [the defendant physician] was practicing emergency medicine at the time of the alleged malpractice and potentially could obtain a board certification in emergency medicine, she was a 'specialist' in

emergency medicine under the holding in *Woodard*. Thus, plaintiffs would need a specialist in emergency medicine to satisfy MCL 600.2169[.]" *Id*. at 630.

Relying on *Reeves*, the majority explains that "the fact that Dr. Abbassi was not actually pursuing board certification in surgical critical care is irrelevant because it is a specialty in which Dr. Abbassi could potentially obtain a board certification, as well as the specialty in which Dr. Abbassi was practicing at the time of the occurrence." I disagree with the majority because I would hold that, looking beyond the label of her rotation, Dr. Abbassi was practicing as a "specialist" in general surgery at the time of the alleged malpractice.

In opposing defendants' motion for summary disposition, plaintiff attached a booklet on certification for general surgery from the American Board of Surgery (ABS), the national certifying body for surgeons practicing in the United States. The ABS defines the scope of general surgery as "a discipline that requires knowledge of and responsibility for the preoperative, operative, and post-operative management of patients with a broad spectrum of diseases, including those which may require nonoperative, elective, or emergency surgical treatment." According to the ABS, a certified general surgeon should have broad knowledge and experience in surgical critical care, as well as the categories of "infection and antibiotic usage" and "metabolism and nutrition." The ABS, which also oversees the subspecialty of surgical critical care, defines that field as "a primary component of general surgery related to the care of patients with acute, life-threatening or potentially life-threatening surgical conditions."[4] The allegations of malpractice against Dr. Abbassi involve her decisions about the provision of antibiotics and tube feeding to Green. While these tasks can fall within the practice of surgical critical care, they are also well within the scope of knowledge of a general surgeon. For instance, Dr. Abbassi testified that, in her training and experience, she had seen surgeons place orders for antibiotics. She also agreed that a surgeon should know what antibiotics to give a patient who turns septic. The malpractice allegations against Dr. Abbassi directly relate to the decision about whether to continue providing antibiotics to Green. As for the tube feeds, Dr. Abbassi claimed that the decision to start tube feeds was made by Dr. Amy Braddock, one of the general surgeons treating Green. This testimony is an implicit acknowledgement that the decision to start or stop tube feeds, even on a critically ill patient, falls within the scope of practice of a general surgeon. While Dr. Abbassi reported to surgical critical care specialists during her rotation in the SICU, she did so as a general surgery resident engaged in tasks common to the practice of general surgery. Neither the label of the rotation, nor the SICU setting, changes that fact. Thus, unlike the majority, I would hold that Dr. Abbassi was practicing as a "specialist" in general surgery during the course of the alleged malpractice.

This conclusion is also consistent with *Woodard* and *Gonzalez*. At the time of the alleged malpractice, Dr. Abbassi was a third-year general surgery resident on her second week of a required rotation in the SICU, and pursuing board certification in general surgery. She limited her training to general surgery, received "advance training" in that field, and could "potentially become board certified" in that specialty. See *Woodard*, 476 Mich at 561-562 (quotation marks

---

[4] American Board of Surgery, *Specialty of Surgical Critical Care Defined*, <https://www.absurgery.org/default.jsp?aboutsccdefined> (accessed May 2, 2023).

and citation omitted). Thus, *Woodard* and its interpretation of "specialist" support that Dr. Abbassi was practicing as a "specialist" in general surgery. Furthermore, *Gonzalez* conditioned its extension of residents as "specialists" only to those residents who "limit their training to a particular branch of medicine or surgery and who can potentially become board-certified in that specialty." *Gonzalez*, 275 Mich App at 299. Importantly, in that case, it was "not disputed" as a factual matter that the defendant resident "was a third-year surgical resident practicing within that discrete specialty on the date of the occurrence." *Id*. at 297. Here, of course, the parties disagree whether Dr. Abbassi was practicing within the specialty that matched her residency program. Consistent with *Gonzalez*, Dr. Abbassi could not be considered a "specialist" in surgical critical care because she did not limit her training to that specialty. See *id*. at 299.

Because Dr. Abbassi was practicing as a "specialist" in general surgery, plaintiff's proposed expert must specialize in that field. See MCL 600.2169(1)(a). Dr. Nirgiotis is a board-certified physician in general surgery and thus satisfies § 2169(1)(a)'s "same specialty" requirement. That said, I agree with the majority that Dr. Nirgiotis is not qualified to offer testimony under § 2169(1)(b)'s majority-practice requirement as interpreted by *Woodard*. "[I]n order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty." *Woodard*, 476 Mich at 566. That means the expert must have spent more than 50% of his professional time in the relevant specialty during the preceding year. *Kiefer v Markley*, 283 Mich App 555, 559; 769 NW2d 271 (2009). Crucially, *Woodard* held that "one cannot devote a 'majority' of one's professional time to more than one specialty."[5] *Woodard*, 476 Mich at 566.

Despite significant overlap in the skills used to practice general surgery and pediatric surgery, *Woodard* requires that we apportion a physician's time into separate, circumscribed buckets. Dr. Nirgiotis's deposition testimony definitively shows that, in the year preceding the alleged malpractice in this case, he spent a majority of his time practicing pediatric surgery. He admitted as much, testifying that more than 90 percent of his patients were under 18 years old, and a majority had not reached the age of puberty. Dr. Nirgiotis is employed in the pediatric department and works with pediatric residents; neither of the hospitals where Dr. Nirgiotis works

---

[5] As one of my colleagues has aptly noted, this interpretation makes little sense "because in reality there is a substantial overlap between the work of specialists and subspecialists." *Higgins v Traill*, unpublished per curiam opinion of the Court of Appeals, issued July 30, 2019 (Docket No. 343664) (GLEICHER, J., concurring), p 8. "*Woodard* compels a contorted calculation of which specialty or subspecialty consumes the majority of an expert's time based on the notion that it is possible to practice only one thing at a time." *Id*. To that end, Dr. Nirgiotis, while primarily practicing the specialty of pediatric surgery, undoubtedly applied many of the skills and principles learned in his general surgery residency. Pediatric surgery is a subspecialty of general surgery, and thus, unsurprisingly, the two areas of medicine contain significant overlap. For instance, as Dr. Nirgiotis testified, there is often no functional difference between a surgical operation on an adolescent and an adult: "[t]hey're exactly the same type of surgery, the same procedure done, the same complications, the same risks."

even have a general surgery residency program. Because Dr. Nirgiotis did not devote a majority of his professional time to the practice or instruction of general surgery in the year preceding the alleged malpractice, he is not qualified to offer standard-of-care testimony against Dr. Abbassi. See MCL 600.2169(1)(b).

This case exemplifies why reexamination of our precedent and its interpretation of § 2169(1) is much needed. The result here—that a board-certified general surgeon with 30 years of experience is unqualified to offer expert testimony about alleged malpractice committed by a general surgery resident on a brief rotation in the SICU—makes little sense. Fortunately, our Supreme Court has recently granted leave to address, among several issues, "whether *Woodard v Custer*, 476 Mich 545 (2006), was correctly decided and is consistent with the requirements of MCL 600.2169(1)" and if not, what test should apply. *Selliman v Colton*, 982 NW2d 396 (Mich, 2022); *Stokes v Swofford*, 982 NW2d 397 (Mich, 2022). It is my hope that the Court will adopt a more workable and practical test that is consistent with the plain language of MCL 600.2169(1).

### III. CONCLUSION

I respectfully dissent from the majority's conclusion that Dr. Abbassi was practicing as a "specialist" in surgical critical care. In all other respects, I concur in the decision to affirm in part and reverse in part the trial court's order.

/s/ Kristina Robinson Garrett